The next case is Beijing Mining v. Mongolia. Thank you, Chief Judge Livingston, and may it please the court. My name is Chris Provenzano for the petitioner's appellants. This case comes before you in a very unusual posture for an arbitration case. This is a case that involves the threshold issue of whether the plaintiff's claims which are for compensation for an expropriation fall within the arbitration clause of the bilateral investment treaty between China and Mongolia. The decisions of the Supreme Court in this court enforcing those decisions make it very clear that a determination of whether a particular claim falls under an arbitration clause is presumptively one for the court and not for the court. I'd like to lay out four basic points that make our argument and compel the result that the decision of the district court below that confirmed the award and denied our petition to vacate the award must be reversed. The award which denied that it had jurisdiction over the claim should be vacated and this court should hold on de novo review of the treaty. Mr. Provenzano, let me just ask you, I want to make sure I understand your legal position. Is your position that that clear and unmistakable proof cannot come from conduct? That it has to be in the agreement? Haven't we made clear in the Opal's case that if the facts are correct that it can be demonstrated by conduct, right? Well, the Opal's the respondents never raised the issue and this points to, I think, a fundamental flaw. Let me read you one sentence from Opal and you tell me where I'm missing the point. If a party participates in arbitration proceedings without making a timely objection to the submission of the dispute to arbitration, that party may be found to have waived the right to object to the arbitration. So, that seems to suggest, again, that we found in that case the facts didn't support it, but that you can, if the facts are there, demonstrate that through conduct, right? Well, Judge Bianco, I think that's correct. In theory, there may be some course of conduct in which one could say that a claimant gave up. If that's possible in theory, why wasn't there a clear and unmistakable course of conduct here? The Chinese companies initiated the arbitration. They put the issue of arbitrability to the arbitrators. They participated for seven years. They never objected. They wanted the arbitrators to decide the issue. I mean, why isn't that clear and unmistakable? The short answer is because both the Supreme Court and this Opal's case, which Judge Bianco just quoted from, the Opal's case quotes first options and says very clearly that the fact of participating in the arbitration hearings to resolve arbitrability does not constitute a waiver. Opal's was very clear on that point. But they made a forceful objection in Opal. It wasn't just participating alone that creates the waiver, and we found they made a forceful objection. Here, as Judge Shin pointed out, it's the initiation of the arbitration. It's failure to preserve it, to say we have an issue with whether or not this is really on the question of arbitrability. You didn't lodge any objection, and it went on for seven years, and the papers went on and on as to why it wasn't just like a reference to we consent. You went through cases explaining why this was properly before the arbitrator. I'm not sure that I think that the question is, it wasn't just participation alone that created the clear and unmistakable conduct. It was the initiating of the arbitration and then not affirmatively telling the arbitrator, you have jurisdiction over this, affirmatively telling the arbitrator that for seven years, and then when the arbitrator comes out the wrong way, saying for the first time that we don't think you could decide this issue. It's a combination of all those things, not just participating. I think Your Honor is reading things into the record that aren't there. First, there is nothing in the record, and there's no dispute between the parties as to this, that there was no actual agreement, nor is there anything in the record that suggests, and we explained this in the waiver portion of our papers, that we did anything other than what we would have to do as a claimant. If you file or serve a demand for arbitration, you are necessarily invoking the- Why didn't you lodge an objection? Why didn't you lodge an objection to the question of arbitrability at the beginning? We did that by arguing the issue of arbitrability. From the very beginning, we preserved the idea that- Where in the record did you tell the arbitrator that there was no jurisdiction on the initial question? On the issue of who decides arbitrability? Yeah. Point to me in the record where you said there's an issue there. I saw the exact opposite. You argued there was no issue. Your Honor, I can't do that because the law is very clear from first options, through all of AT&T first options, Howsam, and then in the circuit's cases in Opal's on ICE, that there's no need to do so because the presumption runs in favor of judicial review. You acknowledge that in theory, conduct could suffice. Why doesn't this conduct here suffice, as Judge Bianco said, when you look at it all in combination? Because this conduct, we keep referring to conduct. The conduct is exactly what we were required to do. We invoked arbitral jurisdiction under the Bilateral Investment Treaty by serving demand for arbitration. Was there any reason you couldn't have filed for the arbitration? I understand why you needed to do that because your point, I think, of what you had no court to go to before you did that. But is there any reason why you couldn't have initiated the arbitration, but then also filed a lawsuit in court saying the threshold issue of arbitrability is for the court and asking for a stay of the arbitration while the court decided that issue? Was there anything preventing your client from doing that? Yes. As a matter of fact, and that is actually a cornerstone of the District Court's reasoning and Mongolia's argument. The fact is the case law completely forecloses that. If you look at the LAIF case, which this court decided, and which, by the way, Mongolia does not address at all, it makes very clear that there is no relief to be found under the FAA applying the New York Convention once your adversary has responded to the demand for arbitration. Effectively, it says once they've answered the demand for arbitration, they're arbitrating. We're out. And it compels to go the long way around, as we were forced to do. I would suggest you could have filed them simultaneously. The suggestion is that we would have had to have the arbitration, which we wanted, and then file a competing litigation. Not competing. You wanted the arbitration assuming that you could have filed the lawsuit on the same day you initiated the arbitration in New York, suggesting the question of arbitrability should be decided by the court and then, if you really had an issue with that, if you really had an issue with the arbitrator deciding that, I'm suggesting to you that would have been available. Well, there are two responses to that, I think. The first is that it's not at all clear on day one where, you know, first, there is no reason to believe once we invoked the jurisdiction under the treaty, we didn't know what to do. Once they respond, we fall under the LAIF rule that they've responded. You have your arbitration. Come back when you're done. The second point is that on day one, let's say we wanted to pursue that course of action because we intimated that they might raise this defense. It's not at all clear what court we should go to. As we point out, we have the right to an if we go to the Mongolian state courts, as they point out, we have a fork in the road problem and we would have given up all right to an arbitration under the treaty. So, the course of action that the district court suggests and that Mongolia suggests and that I understand your honor to be suggesting is one that was completely foreclosed to us. If we wanted the we could only do it in the way that we did it and, you know, we certainly wanted no delay here either. If anything, the prejudice from the long drawn out process here is against us because we've waited a very long time and have yet to hear have our heard our claims heard on the merits. So, I think that the answer to your question is that the course of action is not possible as a matter of law and it's also not practical under the way that arbitration works. The waiver argument that the district court came up with simply doesn't work. And I would note also that on the issue of waiver, you know, once again, the it is the consistent holding through all the cases that the presumptions are reversed and the presumption is in favor of judicial resolution and also that the supreme court was very clear that silence or ambiguity because of that presumption runs in favor of judicial resolution and there's nothing in the record that says no we want the arbitrators to have final say over this issue. There's nothing in the record that suggests that. And in fact, the district court found that there was no agreement on that point and Mongolia has never pointed to anything in the record that says yes we want the arbitrators to have final say on this. The only thing that they that they point to essentially is that yes we argued the issue and that's exactly what first options and opals and opals on ice and all of the other cases say is not enough. You've reserved three minutes of rebuttal time. Yes, I had not anticipated the entirety of my of my seven minutes to be on this one issue. So perhaps I'll address the treaty on rebuttal. Thank you. Thank you, your honor. Thank you. Okay, Mr. Mr. Nolan, I think you may be muted. I was double muted. I think you can hear me now. Very sorry. Yes, maybe much better. Maybe. Okay. I'd like really to address just two points. The first point I'd like to address it was stated in the reply brief, and it was stated again in the argument I just listened to, that we do not that we concede there to have been no agreement by the Chinese companies, the plaintiffs to commend this question of arbitrability to the arbitrators. There is such an agreement. I want to point you to that agreement. I don't want to take a lot of time with the course of conduct. And then I'd like to address also from the reply, a point about the interpretation of the treaty, because it's our position that this treaty is clear and unmistakable. The treaty itself is clear and unmistakable in commending the decision on arbitrability to the arbitrators. And that's precisely why we have the course of conduct that we do, which is unbroken by the parties to the arbitration, distinct from the parties to the contract with the treaty, the two states reflecting that. So very briefly, with respect to the course of conduct, and without intending to recite it in any real detail, I want to direct you to Joint Appendix 211, Paragraph 38. That is the procedural order number one in the arbitration. That is what is entered at the first session of the Arbital Tribunal. And that reflects the framework within which the arbitration is going to take place. Paragraph 38, which appears under heading N, states that the parties have agreed that the proceeding shall be divided into two phases, the first covering jurisdiction and liability, the second, if necessary, quantum. That is agreement by the parties to the arbitration, that the arbitrators will be the ones deciding arbitrability. And there's no requirement under the law that there be some extra special statement that it be primary. If the decision on arbitrability is commended to the arbitrators, then this court standard of review is the same as it is with respect to any other matter decided by arbitrators, which is a deferential standard. And that is really the issue. I also want to point out in connection with this, that in the reply, you can look actually at the appellant's first brief, page 50. The appellants say that they offered the UNSA trial rules. They say that the UNSA trial rules contain a statement empowering arbitrators to decide jurisdiction. They say, and they maintain throughout, that because we did not agree to that rule, we are able to make this argument. They say that that agreement to that rule would have foreclosed this question. But what we did in that provision of the UNSA trial rules allows. So we have expressed agreement by the parties with respect to arbitrability being commended to the tribunal. And it follows from that, that this court's review is deferential. Now, I'd like... You know, the agreement or the procedural order you just referred to said that the arbitrators would decide jurisdiction. I mean, does that encompass arbitrability, the scope of an arbitration clause? I'm not quite sure. I mean, there is some ambiguity there, I think. Well, in this case, I think that's a useful question, Judge Chin, because in this case... I would hope all my questions are useful. And I wish I had phrased that differently. In this case, the basis of claim is set forth in the bit. There is no right independent of what is in the treaty for any claim to be brought against any sovereign. It's only what's in the treaty. So when jurisdiction is spoken of, it's whether there is a claim that can be decided. So here we throw around the idea of arbitrability. But there is not a claim that is either going to be decided by the tribunal or a court. What the tribunal is deciding is whether there is a claim at all for expropriation as the compensation or an amount when there has been an expropriation. So when they're deciding jurisdiction, they're deciding the question, does this treaty let a decision be made as to whether there's been expropriation? And that's exactly what this whole dispute is about. And I don't want to rehearse it because I want to use my time to address the treaty itself directly. But this was the big issue from the outset. And that's clear from the district court's opinion that was set forth in the very request for arbitration, because whether these treaties, and there are many of them, these first generation Chinese treaties allow for this hot issue in this field. Everybody knew that this was essentially what this case was about. And that was the question that was being commended to the arbitrators at the outset. I'd like now to focus on what the reply says with respect to the treaty itself, because it is our position that the treaty correctly understood is clear and unmistakable that it is the arbitrators who shall determine arbitrability. The reply says that if Mongolia had wanted the tribunal to have primary power over arbitrability, it should have proposed an agreement to that effect. That is, after all, how a default rule works. Here, the default rule protects parties' fundamental right of judicial access unless they deliberately consent to give it up. Now, I don't not want to argue much about US law, because that's not very useful. But I want to take you to First Options, as to what that default rule that's being spoken of here is. In just two bits of language from First Options. At the very beginning of First Options, page 942, when the question is being laid out, the Supreme Court states that it's considering, does the power belong to the Supreme Court primarily to the arbitrator, or to the court? And then it says as follows. Although the question is a narrow one, it has a certain practical importance. That is because a party who has not agreed to arbitrate will normally have a right to a court's decision about the merits of the dispute. Okay? And you relinquish that, they say, if the arbitrability question is one more bit from First Options before I address the treaty. When the clear and unmistakable requirement is being discussed at 944, the court makes essentially the same point in a different way. When it's describing why you require clear and unmistakable evidence with respect to arbitrability, but not other matters. This is what the First Options Court says. And given the principle that a party can be forced to arbitrate only those issues it specifically has agreed to submit to arbitration, one can understand why courts might hesitate to interpret silence or ambiguity on who should decide arbitrability point as giving the arbitrators that for doing so might too often force unwilling parties to arbitrate a matter they reasonably would have thought a judge, not an arbitrator would decide. Okay? Reasonably would have thought a judge, not an arbitrator would decide. Now, Judge Chin, I return to your point. Okay? Reasonably thought a judge, not an arbitrator would decide. This is a bilateral investment treaty. This is between states. They do not function in the context that individuals do in commercial contracts, the normal circumstance that First Options refer to. In the world between states, it is the state of nature. Absent a claim in the bid, there is no authority to determine the claim. And indeed, this court cannot determine expropriation between Mongolia and Chinese nationals. Now, I want to direct you to what Judge Chin said, which is actually correct, but it's not addressing the right issue. Judge Chin, I'm sorry, the district judge, not Judge Chin. The district judge says, the treaty does not contain any explicit agreements regarding what body may decide the arbitrability of an issue. Okay? That is set at page six. That is true. Because the only body that may decide the arbitrability is the arbitral tribunal that is called into existence by the treaty to decide that issue. Okay? That is the only body that may do it. So you need to find clear and unmistakable evidence of an intent by the parties to commend the question of arbitrability to the arbitral tribunal. But in a context where there is no possibility of a court doing that, you do not need the same sort of evidence you would need when you have a party relinquishing a right to courts. And I just want to conclude by saying, this court, in a number of treaty cases, has looked at the UNCTRA rules. The UNCTRA rules contain an express statement that arbitrability is for the arbitral tribunal, and they've correctly decided, based on the fact that those rules are incorporated by reference, that the arbitrability question is for the arbitrators. But it should not be necessary when there is no alternative to arbitral decision-making for there to be a reference to the UNCTRA rules. Here there isn't. Okay? But that isn't necessary. So the district judge read the treaty correctly, did not find an express election between those two things. But that's because there was no need for that election given the structure of the treaty. And I respectfully conclude by saying, I think this point would be extremely useful to clarify, because people are looking for UNCTRA rules and kind of find clear and unmistakable intent. And I think this is a place where the district court went straight. Let me just make sure I'm going to clarify, even though it'd be helpful to decide the treaty issue, if we found that the conduct here, in this particular instance, was clear and unmistakable, we don't have to reach this interesting treaty issue that you've raised, right? Absolutely correct. 100% correct. And I'm very reluctant, in a certain sense, to get drawn into that treaty issue. But I'll also tell you, as a practitioner constantly in this area, that it would be enormously helpful, because it is confused. Because the fact that there is not an alternative, court alternative, is not really appreciated sometimes by decision makers. And it complicates this analysis. But you're absolutely right. If you go no further, I will be very happy. And you don't I have a lot to get through in three minutes. And we didn't even touch the issue of construction of the treaty the first time around. But there's a vital point, which I have to make, that is an error that flows through all of Mongolia's papers, and through the district court's opinion, and that I believe is reflected in some of the questions that the panel has directed to both myself and whether we presented the question of arbitrability to the tribunal, as distinct from whether there was an agreement that the tribunal would have final or dispositive or primary, whichever term you use, the Supreme Court term is primary authority over that question. Of course, we presented arguments as to the arbitral jurisdiction to the tribunal, because we were faced with a challenge to that. That is completely different from saying, and yes, we give you the authority to the rule on this dispositively. Because once you the point of first options and that language is that once you've done that you've given up your presumptive right to judicial review. Mr. Nolan effectively conceded that there was no such occasion in which we did that. They're inferring from the fact that we raised the issue of or not we didn't raise the we defended the issue of jurisdiction. From the fact that we defended the issue of jurisdiction, you should infer that we intended to give the arbitrators final authority over that, with only very deferential review. And there's nothing in the record to suggest that. And in fact, all of the cases that we've cited caution very specifically against making that. But I would think that at a minimum, you would say, while we put this as issue number one, it's our position that the arbitrators do not have jurisdiction to decide that, to decide arbitrability. I mean, you know, in other words, you just tee up the issue without giving any indication that you don't think they have the ability to decide the question. There's your honor, there's nothing in any of the cases that suggests an obligation to do that. And if we had an obligation to do that, it would in fact create asymmetrical obligations. As we point out in our cases, that a respondent who merely says, I don't think you have jurisdiction. The arbitrator says, no, we have jurisdiction. And then they proceed to a merits thing under the first option line of cases, they get a Danova review. Under the interpretation that Mongolia offers a claimant face jurisdiction, we say, well, we think that you do. And then we have an arbitration. And we're deprived of the benefit that respondents would have. So it's absolutely essential to understand the distinction which the cases in this court recognize between simply arguing the issue of arbitrability, and a agreement to commit that decision to the final determination by the arbitrators. That distinction is crucial here. And it's one that this circuit has made many times, including in the VRG case, which they simply do not address. I believe I am now over time, I would have loved to have had a chance to address the number of the other issues. So if there are any questions, I will happily answer them. Otherwise, I would simply urge you to be very attentive to that distinction between presenting argument on the issue of jurisdiction, and making an affirmative agreement to submit that issue to the final determination of the arbitral tribunal. Okay, thank you. Thank you both. Well, well argued, very, very helpful. That is the last case to be argued this morning. So I will ask the clerk to adjourn court. Thank you, Your Honors. Court is adjourned.